STATE *vs.* EARL HUGO BROWN, *alias* HUGO WILLIAMS, and JAMES SHARP.

1. CRIMINAL LAW—CONFESSIONS—VOLUNTARY CHARACTER—ARREST.

Confessions obtained at a coroner's inquest under oath, while accused were in the custody of the sheriff, having been taken from the jail handcuffed to the scene of the murder, where the inquest was held, were involuntary and inadmissible.

2. CRIMINAL LAW—CONFESSIONS—VOLUNTARY CHARACTER—PRELIMINARY PROOF.

Where a detective was offered to prove a confession obtained from accused, they were entitled to cross examine him to ascertain whether any inducement had been held out, and to show by another witness that the confession was in fact obtained by inducement, before the detective would be permitted to disclose the same.

3. CRIMINAL LAW—EVIDENCE—CONFESSIONS—PROMISE.

A statement by witness to the prisoner, at the time of an alleged confession, that the prisoner should tell the truth, that it would be better for him, was not such an inducement as would require the exclusion of the confession as involuntary.

4. HOMICIDE—MURDER—"MALICE".

"Malice," as an element of murder, is a condition of the mind or heart. It is not restricted to spite or malevolence towards the particular person slain, but includes general malignity and reckless disregard of human life, which proceed from a heart void of a just sense of social duty and fatally bent on mischief, so that, wherever the fatal act is done deliberately or without adequate cause, the law presumes that it was done with malice, and the burden is on the prisoner to show that the act was not malicious.

5. HOMICIDE—PRINCIPALS AND ACCESSORIES—STATUTES.

*Rev. Code* 1852, amended to 1893, *p*. 975, *c*. 133, § 1, provides that every person who shall abet, procure, command, or counsel any other person or persons to commit any crime or misdemeanor, shall be deemed an accomplice, and equally criminal as the principal offender, and shall be punished in the same manner. *Held* that, where either of several alleged to be implicated in a homicide inflicted the mortal wound, it was sufficient for the conviction of the others, provided they were aiding and assisting in the assault on deceased.

6. CRIMINAL LAW—WEIGHT—EVIDENCE—CONFESSIONS.

Where a confession of guilt was reduced to writing and signed by the person making it deliberately, without being influenced by threats or promises by others, it should be regarded as convincing evidence, in the absence of proof to the contrary; the degree of credit being for the jury.

7. CRIMINAL LAW—EVIDENCE—CONFESSION—CO-DEFENDANTS.

After the commission of a crime has been accomplished, no one engaged in it can, by any subsequent declaration of his own, not made or done in the presence of any of the others, affect them; and a confession is therefore not admissible against co-defendants.

8. CRIMINAL LAW—BURDEN OF PROOF—PRESUMPTION OF INNOCENCE.

In order to convict of a crime, the burden is on the state to prove every material element of the offense charged; the accused being presumed innocent until his guilt is established beyond a reasonable doubt.

9. CRIMINAL LAW—"REASONABLE DOUBT."

Proof beyond a "reasonable doubt" does not require that guilt be established with the absolute certainty of a mathematical demonstration, nor does it mean a vague, speculative, or whimsical doubt, nor a mere possible doubt, but such a doubt as an intelligent, reasonable, and impartial man may honestly entertain after a careful examination and conscientious consideration of all the evidence.

(*February* 13, 1911.)

PENNEWILL, C. J., and BOYCE and CONRAD, J. J., sitting.

*Frank M. Jones*, Deputy Attorney General, for the state.

*Daniel J. Layton, Jr.*, for the prisoner Brown.

*Charles S. Richards* for the prisoner Sharp.

Court of Oyer and Terminer, Sussex County, February, 1911.

The accused were indicted jointly for murder of the first degree.

At the trial the state produced evidence consisting chiefly of oral confessions of the prisoners made to different witnesses to the effect that on the morning of June 21, 1910, the prisoners (two colored boys about the ages of seventeen and eighteen years of age), together with John Rogers, (a white boy about fifteen years old, who was afterwards murdered,) were sent by Mr. Wilmore M. Rogers, the father of the deceased, out in his field to thin or sucker corn. That after reaching the field some slight altercation arose between the boy Rogers and the two colored boys and they subsequently proceeded with their work, but the effect of the altercation was to leave in the minds of the colored boys a desire to kill John Rogers, and they discussed plans as to how they might put him to death. Their first idea was to club him to death with the thinning sticks which they were using in their work, but the opportunity not presenting itself they continued working until the noon hour without further trouble. Upon returning to their work in the afternoon, John Rogers, the boy who was killed, took with him into the field a shot gun for the purpose of shooting a flicker which they heard down in the woods adjoining the field where they were working. He told the colored boys to proceed with their work while he went into the woods to shoot the bird. He soon came back, having failed to shoot it, and not feeling very well sat down on the ditch bank under a tree, gave the gun to the

colored boy Brown and told him to go in the woods and shoot the
fl cker. Brown went and shot the flicker and came back with the
gun. In the meantime, Rogers had lain down and fallen asleep.
He was lying on his left side with his back towards where Brown
came with the gun. Seeing Rogers in this position, half or wholly
unconscious and dozing, the two colored boys thought that then
was the proper time to carry out their purpose which they had
formed in the morning, of killing the boy Rogers. Accordingly,
Sharp said, "Now is your chance," and Brown being within three
or four feet of where Rogers lay asleep, picked up the single barrel
shot gun, placed it across his knee, deliberately aimed at the back
of Rogers' head and fired, hitting him with deadly effect and caus-
ing instant death; their statement being that he never moved or
quivered. Finding that Rogers was dead they dragged him face
downward across the rough ground to a thicket or woods in the
neighborhood of a quarter of a mile; Sharp in the meantime hav-
ing gone to the house and obtained a shovel with which they dug
a hole and buried and covered up the dead boy, and also con-
cealed the gun in like manner in a very shallow trench. They then
continued their work until nightfall and upon going back to Mr.
Rogers' house were asked by Mr. Rogers what had become of
John; they said he had gone into the woods to shoot a bird and
they had come on home. After waiting a reasonable time for the
dead boy to come back members of the family went out to search
for him, taking the two colored boys with them to show
them where John was last seen. They searched for sometime
unsuccessfully, the colored boys intentionally leading them away
from the spot where they had buried John. Finally neighbors
were sent for and came over and assisted in the search. A brother
of the dead boy found the mound of fresh earth where he was bur-
ied and upon removing the loose dirt with his hands discovered
the body of his dead brother. Some one of the party also found
the gun near the body. Upon being charged with the crime the
colored boys admitted the killing; their statements varying some-
what as to who did the actual killing, but each admitted his par-
ticipation in the crime.

The state sought to introduce in evidence a statement made

by the prisoners at the coroner's inquest under oath, taken in writing and signed by the prisoners, they being at the time in the custody of the sheriff, having been taken from the jail handcuffed, to the scene of the murder where the said inquest was held.

Mr. Layton, counsel for the prisoner Brown, objected on the ground that, where a person is suspected of a crime, or is under arrest charged with a crime, and is taken before a coroner's jury, and put upon oath, any statement so made amounting to a confession is not a voluntary statement and is inadmissible. 1 *Greenleaf Ev.*, 225-6; *Roscoe's Crim. Ev.*, 47; *Underhill Crim. Ev.*, 131; *People v. Mondon*, 103 *N. Y.* 211, 8 *N. E.* 496, 57 *Am. Rep.* 709; *People v. Chapleau*, 121 *N. Y.* 266, 24 *N. E.* 469; *People v. McMahon*, 15 *N. Y.* 384; *Lyons v. People*, 137 *Ill.* 602, 27 *N. E.* 677; *State v. Young*, 119 *Mo.* 495, 24 *S. W.* 1038; 2 *Starkie Ev. *p.* 39; *McKelvy Ev.* 117; *Wilson v. State*, 110 *Ala.*, 20 *South.* 415, 55 *Am. St. Rep.* 17, *diss. opin.*; *State v. Garvey*, 25 *La. Ann.* 191; *Farkas v. State*, 60 *Miss.* 847; *Schoeffler v. State*, 3 *Wis.* 823.

PENNEWILL, C. J., delivering the opinion of the court:

[1] It is admitted that these alleged confessions were obtained at the coroner's inquest and after the prisoner was sworn as a witness, after it was known that a crime had been committed and not only that, but that suspicion rested upon the prisoner and he was practically charged then with the crime and had been incarcerated for it, and was taken from the jail to the coroner's inquest there testifying under oath. We think that under the law that has been cited, and under the peculiar facts and circumstances of this case, the alleged confession is not admissible. We therefore sustain the objection.

The state further sought to show by W., a state detective, an admission made by one or both of the prisoners as to what they had done with the body of the boy after shooting him. Mr. Layton was permitted to cross examine the witness as to whether or not any inducement was held out, which elicited the answer, "I said that the boys were to tell the truth and nothing but the truth in the matter." Mr. Layton thereupon asked at this point to be

permitted to produce a witness to contradict the above testimony, contending that,—

When a confession of the accused is offered against him, he has a right to cross-examine and call another witness on the preliminary question as to whether such confession was voluntary   *Com. v. Culver*, 126 *Mass.* 464;  *Brown v. State*, 70 *Ind.* 576;  *Lefevre v. State*, 50 *Ohio St.* 584, 35 *N. E.* 52; *Roesel v. State*, 62 *N. J. Law* 216, 41 *Atl.* 408.

The state objected on the ground of irregularity.   The objection was overruled and the request allowed.   A witness thereupon being called testified that what the witness W. said to the prisoner at the time of the alleged confession was, "Tell us the truth; it will be better for you."

Mr. Layton thereupon objected to the state proving by the witness W. what the prisoners stated to him in the alleged confession on the ground that,—

Confessions are held inadmissible obtained after persons in authority have said, "It will be better for you," or like words. *Rex v. Griffen, R. & R. C. C.* 151;  *Rex v. Kingston*, 4 *Carr. & P.* 387;  *Rex v. Enoch*, 5 *Carr. & P.* 539;  *Sherrington's Case, Lewin, C. C.* 123;  *Rex v. Thomas*, 6 *Carr & P.* 353;  *Rex v. Simpson, Moody, C. C.* 410;  *Rex v. Garner*, 1 *Den. C. C.* 329;  *Kelly v. State*, 72 *Ala.* 244;  *Reg. v. Hatts*, 49 *L. T.* (*N. S.*) 780;  *Ford v. State*, 75 *Miss.* 101, 21 *South.* 524.

PENNEWILL, C. J.:—[3] We think we cannot exclude this testimony now.   We will hear you later, and if you convince us that it was improperly admitted we will instruct the jury not to consider it.

PENNEWILL, C. J., charging the jury:

Gentlemen of the jury:—In this indictment Earl Hugo Brown, *alias* Hugo Williams, and James Sharp, the prisoners at the bar, stand charged with murder of the first degree for the felonious killing, with express malice aforethought, of John Rogers on the twenty-first day of June last in Georgetown Hundred in this county.

There are three counts in the indictment. The first charges that the prisoners feloniously, willfully and with express malice aforethought committed an assault upon one John Rogers, and that the said Williams, *alias* Brown, feloniously and with express malice aforethought killed the said John Rogers by shooting him in the head with a shotgun.

The second count charges that the said Williams, *alias* Brown, feloniously and with express malice aforethought, did kill and murder the said John Rogers.

The third count charges that James Sharp, at the time the said felony and murder was committed, feloniously, willfully and with express malice aforethought, was present, aiding, helping, assisting, abetting, procuring, commanding and counseling the said Earl Hugo Brown, *alias* Hugo Williams, in the commission of the felony and murder aforesaid.

The prisoner being indicted for murder of the first degree, it becomes the duty of the court to state to you, as clearly as we are able to do, what constitutes that degree of murder, and we feel it incumbent upon us to tell you also what constitutes murder of the second degree, and manslaughter, because a statute of this state provides that: "A person indicted for murder may be found guilty of either degree of murder, or of manslaughter."

[4] Homicide, we may say, is the killing of one human being by another. Felonious homicide is of three kinds: Murder of the first degree, murder of the second degree, and manslaughter. Malice is an essential ingredient of the crime of murder of both degrees. Without malice there can be no murder either of the first or of the second degree. Malice is a condition of the mind or heart. As here used this term is not restricted to spite or malevolence towards the particular person slain, but also includes that general malignity and reckless disregard of human life which proceed from a heart void of a just sense of social duty and fatally bent on mischief. Whenever the fatal act is done deliberately or without adequate cause, the law presumes that it was done with malice, and the burden is on the prisoner to show from the evidence or by inference from the circumstances of the case, that the act was not done with malice.

Charge.

Murder of the first degree is where the killing was done with express malice aforethought. Express malice aforethought is where one person kills another with a sedate, deliberate mind and formed design, which formed design, or purpose, may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon, knowing it to be such, stealthily lying in wait, preconcerted plans, or the previous procurement or preparation of instruments, contrivances or other means for slaying the victim.

Murder of the second degree is where the killing was done with implied malice; that is, where the malice is not express, as in murder of the first degree, but is an inference or conclusion of law from the facts actually proved. It is where there is no deliberate mind or formed design to take life, but where the killing was done without justification or excuse and without provocation, or without sufficient provocation to reduce the offense to manslaughter. For example, where the killing was done without design and premeditation, but under the influence of a wicked and depraved heart, or with a cruel and reckless disregard of human life, the law implies malice and makes the offense murder of the second degree.

Malice is implied by law from every unlawful and cruel act committed by one person against another, for the law considers that he who does an unlawful and cruel act voluntarily, does it maliciously. Where the killing is shown to have been done with a deadly weapon, that is, with a weapon likely to produce death, it is presumed to have been done maliciously.

Manslaughter is where one person unlawfully kills another without malice. For example, when one in a sudden affray, or fight, in the heat of blood, or in a transport of passion, inflicts the mortal wound without time for reflection or for the passions to cool.

[5] A statute of this state provides that, "Every person who shall abet, procure, command, or counsel any other person, or persons, to commit any crime, or misdemeanor, shall be deemed an accomplice and equally criminal as the principal offender, and shall be punished in the same manner, and with the same punishment."

*Rev. Code*, 1852, amended to 1893, *p.* 975, *c.* 133, § 1.   Therefore, if the jury is satisfied that either of the prisoners inflicted said mortal wounds, it is sufficient for the conviction of the other, who was, if you so find from the evidence, aiding and assisting in the felonious assault upon Rogers the one who actually inflicted them, because, in contemplation of law, it becomes the act of each and all of those who were co-operating and participating in the perpetration of the crime then and there committed.

[6]   Confessions of guilt should not be received where they are not free and voluntary, but procured through the influence of threats or the promise of favor.   Both their admissibility and value as evidence depend upon their being deliberate and voluntary, and on the presumption that a rational being will not make admissions prejudicial to his interests and safety unless impelled to do so by the promptings of truth and conscience.   A confession of guilt reduced to writing, and signed by the person making it, if deliberately made and signed, without being influenced thereto by any threats or promises by others, should be regarded, in the absence of evidence to the contrary, as strong and convincing evidence in the case.   The degree of credit due to a confession is to be estimated by the jury under the circumstances of the particular case.   The whole of what the accused said on the subject at the time of making the confession should be taken together. The jury may believe that part which criminates the accused and reject that which is in his favor, or credit so much as is in his favor and discard that which is against him, if they see sufficient grounds, upon all the evidence, for so doing, for the jury are at liberty to judge of it, like any other evidence, from all the proven circumstances of the case.

[7]   After the commission of a crime has been accomplished, no one engaged in it can, by any subsequent declaration or act of his own, not made or done in the presence of another, affect such other person.   The confession, therefore, so subsequently made, is not admissible in evidence as such against any one but himself.

Gentlemen of the jury, you have listened very patiently and attentively to the presentation of this case, and it will now become

Charge.

your duty to determine from the evidence, applying thereto the law as we have stated it, whether the prisoners are guilty or not guilty. The case is important to the prisoners and also to the people—the state. It should receive from you the most careful and conscientious consideration, and we believe it will.

[8] In conclusion, we say that in every criminal prosecution the defendant is presumed to be innocent until his guilt is proved to the satisfaction of the jury beyond a reasonable doubt. In order to convict the prisoners it is incumbent upon the state to prove beyond such a doubt every material element or ingredient of the crime charged. If, after carefully considering and weighing all the evidence, you should entertain a reasonable doubt of the guilt of the prisoners, you should give them the benefit of such doubt, and your verdict should be not guilty.

[9] But proof beyond a reasonable doubt does not mean that the guilt of the accused must be established with the absolute certainty of a mathematical demonstration. Matters of fact are required to be proved to a moral certainty. To require more in dealing with human conduct, and the affairs of life, would be impracticable and therefore unreasonable. It is sufficient that any disputed fact in the case shall be established by that amount of competent and appropriate evidence which will satisfy a fair and unprejudiced mind beyond a reasonable doubt.

Reasonable doubt in the legal sense, therefore, does not mean a vague, speculative or whimsical doubt, nor a mere possible doubt, but a substantial doubt, and such a doubt as intelligent, reasonable and impartial men may honestly entertain after a careful examination, and conscientious consideration of all the evidence. If after carefully and conscientiously considering all the evidence in the case you believe that the guilt of the prisoners has been established beyond a reasonable doubt, your verdict should be guilty. If you are not satisfied beyond a reasonable doubt of the guilt of the prisoners, your verdict should be not guilty.

This being an indictment for murder of the first degree you may find the prisoners guilty in manner and form as they stand indicted, that is, of murder of the first degree; or you may find them guilty of murder in the second degree, or of manslaughter,

according as the law and the evidence may warrant. But unless you find the accused guilty of one of these three grades of homicide, you should render a verdict of not guilty.

You may find both of the prisoners guilty or you may find one of them guilty and the other not guilty, or you may find them both not guilty as the law and the evidence in your judgment shall warrant and justify.

    Verdict, guilty.